Case number 13-5163. John Vanderkam et al. Appellant v. Melissa Vanderkam. Mr. Jeffrey for the Appellant. Mr. Fuller for the Appellee. Good morning, Your Honors. May it please the Court. My name is Joseph Jeffrey and I represent the Appellant, John Vanderkam, in this matter. Your Honors, this is a case about one's freedom to dispose of their ERISA benefits as they please. Melissa Vanderkam waived, disclaimed, and awarded to John Vanderkam her right to the survivor benefits under John Vanderkam's pension plan. That much was confirmed by a Texas court within the year following their divorce in 2002. Didn't the Pension Board conclude that wasn't the case? What the PBGC decided, Your Honor, was that Melissa did not waive the right to receive the benefit from the plan. The pension benefit, the PBGC did not address whether or not Melissa waived the right to retain the benefit upon receipt. What the Texas court said... But you don't challenge the fact that the Pension Board's ruling that it was not a QDRO. You're not challenging that. We do not, Your Honor. Okay. We do not. We agree. Your whole argument then is you agree that you're not challenging the finding that it wasn't a QDRO. You're not arguing that she waived her QJSA under ERISA. Your whole argument is that having received the money, once she receives... The difference, right, between the plan and the receipt of the money. That's your point. That's correct, Your Honor. We do not dispute that... That's what the case is all about. That's the issue in the case. That's correct, Your Honor. We do not dispute. In fact, we agree that the PBGC must pay the survivor benefit to Melissa Vanderkam. Okay. John's claims are that upon receipt of those benefits, Melissa has waived and awarded to John her right to retain the benefits. That's what John's claims are about. Melissa's argument is that conflicts with federal law because what Congress wanted was to ensure a stream of income to surviving spouse beneficiaries. That sets up the question here, does giving someone the right to receive a benefit limit in any way their right to dispose of the benefit? Because what we say happened here... I'm curious about your concept that when this bag of money, for lack of a better phrase, falls in her hands... Yes. That's what you're regulating, not the plan or the right to the money, but the bag of money. Absolutely, yes. That she could have a constructive trust in favor of somebody who's no longer with us. I mean, that money isn't in her hands until Mr. Vanderkam is no longer with us. How can you have a constructive trust for someone who does not exist? Well, it's for Mr. Vanderkam's benefit. That's what the statute says. What statute? The Texas statute that we're relying on for John's declaratory judgment action. My understanding of at least Texas constructive trust law is that you can't have a constructive trust until someone is actually in possession of, as I'm calling it, the bag of money. So how could you have a constructive trust before that bag of money exists? And once it exists, John Vanderkam won't exist.  Our action, Your Honor, is we're seeking a declaratory judgment that upon John's death, when the survivor benefit is payable, Melissa must hold that bag of money for John's benefit. And in this case, since John will no longer be with us, that's his estate. That's why I was curious. Your complaint didn't ask for a constructive trust or equitable title to his estate, but to him specifically. I don't recall specifically, Your Honor, but that was the intent. Obviously, if John is no longer with us, that is a benefit that is to John's heirs, which in this case would be his estate. And that's part of the reason why we — and I'm slipping into another topic here, but this is part of the reason why the issue was ripe is because it really interfered — not being able to address this issue. If we weren't able to address this issue now, it really interferes with John's ability to plan what his estate is going to look like. Wasn't this exact argument you're making rejected in Boggs and Hillman? I beg your pardon, Your Honor? Wasn't this precise argument you're making rejected by the Supreme Court in Boggs and Hillman? No, Your Honor. In Boggs and Hillman, what you had is state law trying to elbow its way into a federal beneficiary scheme. In other words, they were trying to compel — Just like this case. No, Your Honor. I disagree, Judge. The state laws in both of those cases were trying to compel somebody to give up a benefit and reassign it to a beneficiary that the state preferred. In this case, Melissa voluntarily waived, disclaimed, and awarded the benefit to John in exchange for other consideration reported in the party's divorce decree. That's part of what she gave — You conceded that as a matter of federal ERISA law, there was no valid waiver. Right. That seems odd. There was no waiver of the right to receive the benefit from the plan. Well, it seems — That brings me back to Boggs and Hillman, which says that it — it rejects that distinction you're making. That's why I asked you about Boggs and Hillman. I'm sorry, Your Honor. Boggs — what Boggs said was that it doesn't matter when it's asserted, whether it's asserted before or after benefit is paid. It's the — the issue in Boggs was the state law that gave someone the right to claim benefits was preempted because what it would have done is created a whole new set of beneficiaries under an ERISA plan. In other words, the beneficiaries that state law would have created in Boggs would have had, if you agreed with state law, a right to make a claim on the plan itself to receive the benefits. The fact that the — that the fact that the parties in that case waited until the benefits were paid to assert that claim was irrelevant as far as the court was concerned because it conflicted with ERISA by creating beneficiaries that were otherwise unknown to the plan. So is your point that those two cases are different because they dealt with state laws, whereas here it would be a state court order? Is that the difference? I'm sorry. Is that the difference between this case and Hillman and Boggs? In those cases, there was a state statute that — No, Judge. The difference is it was compulsory in those cases. The state law, whether it was a state statute or a waiver, would have compelled the benefit to go somewhere else. Here, Melissa — I don't think it compelled the benefit. I think what you mean is compelled the administrator to pay someone else, and that that's the key distinction. That's right, Your Honor. Whether it affects the administrator's obligations in any way. And if he's supposed to pay Melissa and Melissa uses the money to buy a car or assigns it to a current creditor at the time or pre-assigns it, what have you, it doesn't affect the plan administrator. That's correct, Your Honor. That's your argument. That's correct. Now, here's my question. Okay. You said that John needs to know what the state's going to look like, but he can't know and he won't know regardless of the outcome here because that's going to depend upon the sequence in which John and Melissa die. If John knows that he has a right — if his right to the benefit is confirmed in this case, he can account for that. He can — as it is right now, if John were to die today and he were entitled to benefits, it would fall under a residuary clause in his will, which works. It's fine. It distributes the benefit, but it may not be the most efficient way to handle that benefit. If Melissa dies earlier today than John, there is no benefit. That's correct. So how can he make a plan based on a benefit that may or may not exist when he dies? Well, I don't think it's uncommon to plan your estate in anticipation of benefits that — or payments that you may be receiving or property you may receive from somebody else. Well, if the plan cannot anticipate one way or the other whether that property will be coming in, then it's not going to affect the content of the plan. It could affect — And our decision today has no consequence. I disagree, Judge, because it could affect — as far as the estate planning goes, it could affect what he does with the money. If John Vanderkam has a brother who's a billionaire — The only way it could affect that is that I can figure out. Yeah. Is if he could get a second-to-die policy based on his life and Melissa's, which he cannot because of the divorce. There's a moral hazard no company would issue, nor would such a policy be valid. I understand what you're saying, Your Honor. My point is it's not uncommon, in my experience, to have estate plans that if someone has a rich brother and they know that the brother has no offspring, no wife, no other heirs, they anticipate that if their brother predeceases them that they are going to inherit that money, and they plan for that. They plan for that because what if they inherit it and the next day they die? And that's the situation that we have here. That's the harm that — Well, you can plan for the possibility that Melissa would post-decease John. There would be a benefit. And you don't know whether it would last for one month or for 20 years. Understood, yes. So I still don't see how this can affect the plan. I understand what you're saying, Your Honor. You're asking us to weigh into a difficult area fraught with federal and state relations and so on. Yes. And are hard put to tell us really anything that material depends upon this being decided now. Well, I think there are material — When we don't know who's going to die. I think there are material interests here, Judge. I take your point that it's — that you just don't know, you can plan it, and you still don't know. And I don't disagree with that at all, but the uncertainty of not knowing and the uncertainty of being unable to plan in the event it does happen is a real interest that John has. It's a real interest that John and, frankly, Melissa both have. And it's not only the uncertainty of being unable to plan, it's also the uncertainty of knowing how the estate is going — how John's beneficiaries are going to be taken care of. John has, as the record reflects, John and Melissa share a son. So in addition to John's wife, Kay Lynn, he also has a son. Well, excuse me, but the contingency you've outlined, that is to say, that could be accommodated in the planning, even though — We're talking about the estate plan? Yeah, I'm sorry, yes, in John's estate planning. That if only we would answer the question presented today, John could then make a series of contingent arrangements in his estate. That's true even if we don't decide the matter today, depending if just one of the contingencies is whether Melissa has pre-deceased him. Which gets to the other harm that not deciding this opinion would have — deciding this issue would have on the parties, both of the parties. There is a peace of mind concept here that is important to know. John isn't — John gave up property. Peace of mind is not the lot of man. It's — That's a certainty in James' version. It's — the peace of mind is an important concept. I think in the supplemental briefing, we identified a Seventh Circuit case where Judge Posner was talking about the concept that if someone is denied — if a term life insurance company terminates your policy, you think wrongly, the insurance company won't be heard to claim, well, you don't really have a — you don't really have a harm there because you're probably going to die well after the term would have expired anyway. As Judge Posner pointed out, there's a peace of mind concept that people have when it comes to buying insurance. It's not because they think that the insured against event is going to occur. I understand that. You just don't have an insurable interest here. I'm not sure I follow. John does not have an insurable interest in Melissa's life. True, he doesn't. They're adverse parties. Yes. Yes, that's true. But it doesn't — but the uncertainty of not knowing how this is going to play out, not — the uncertainty of knowing that he had a right that was declared in 2002, confirmed in 2003, and now Melissa is challenging,  and it's important for both John and Melissa to be able to address that now. And I want to ask a separate question about whether there really is any way to differentiate between regulating her right to receive a benefit from the plan and her right to keep the money when she gets it. If you — if a court were to impose, in whatever form, an order on that bag of money that says as soon as you get it, you have to hand it off to someone else, how have we not altered the nature of the legal right she has under the plan? On the one hand, she has a legal right to receive the benefit, and it's her benefit to do with it she places when she has it. Or she has the legal right — you want to change it to the legal right to receive a bag of money that she has no control over whatsoever. Those are materially different legal interests, are they not? Well, she exercised her right over the benefit that belongs to her by waiving, disclaiming, and awarding it to John. Not as a matter of ERISA law. And so the question is, has her right under ERISA, as ERISA looks at her right under this plan, is it changed when it is suddenly saddled with a duty to manage that money, handle it for someone else? If I have a right to receive a benefit for me to use as I desire, that's one thing. If I have a right to receive a benefit that I'm holding in bailment for somebody else, in trust for somebody else, those are very different legal interests. I don't see how you're not altering what it is she has under the plan itself by imposing this. I'm sorry, Your Honor. What you're talking about is where do the ERISA rights begin and end? And I submit to you that to ascertain that, you have to look at what Congress has intended. And what Congress intended was that a stream of income would be paid to surviving spouse beneficiaries. That's all that it's ever been. I guess what I'm trying to say is that what you're calling the stream of income, there's two types of streams of income. There's a stream of income that is actually mine, and there's a stream of income that passes through me to someone else. And I think my point is that you're changing what that stream of income is. If I have a right to a lottery ticket that I get to collect the money and keep it, that's a valuable thing. If the state said you can buy a lottery ticket and you can hold the money for a minute and then you have to hand it back to the state, nobody's going to buy that lottery ticket because that stream of income that you're entitled to when you win is very, very different. But if you bought the lottery ticket, Your Honor, and if you signed a contract that said, I'll buy a lottery ticket, and if I win, you can have the proceeds, that's not changing the state lottery character of the benefit. That is changing the character of the benefit once you obtain possession of it. And that's what Melissa Vanderkam did here. See, I go back to an antecedent question. I guess I don't see how you can at the same time acknowledge that the divorce decree was not a QDRO. You acknowledge that, right? Yes, yes. But yet also argue that it amounted to a waiver. I just don't understand that. So the difference is the federal. Yeah, what's the difference? The difference is there's the ERISA right, which is the right to receive the money. That's declared in the statute and it's confirmed in the plan. The character of that benefit is that it will be paid to a surviving spouse, in this case, Melissa. And that's where it ends. Congress hasn't spoken. That same argument was rejected by the Supreme Court in Boggs and Hillman. Judge, the difference, again, the difference in Boggs and Hillman, respectfully, is that in both of those cases, you didn't have a waiver. You didn't have a beneficiary saying, you can have this. I'll take something else from you. You can have this. What you had was a state law that said. Here we have a QJSA that you concede vested and was not waived. I concede that the right to receive it vested, yes, and that the right to receive it was not waived. But both of those only go to who has the right to receive the benefit under the plan. Nothing in ERISA tells any ERISA beneficiary, whether it's a QJSA or whether it's life insurance proceeds, what to do with the benefits once they have them in their pocket. Do you have any case that involves a QJSA that holds? The Ninth Circuit went the other way, right? The Ninth Circuit went the other way, Your Honor, and as we explain in the briefs, it's based on misperceptions. I understand you think it's wrong, but is there any case involving a – you cite a lot of cases in your brief, but none of them involve QJSAs. To date, Your Honor, the only one that's dealt with a QJSA in the context of an instructive trust waiver is the Carmona decision. All of the other ones deal with welfare benefits. But I submit to you the concept that ERISA – the concept that Congress intended beneficiaries of the QJSA to receive a stream of income is no different than Congress's intent that someone who's a beneficiary of a life insurance policy under ERISA would receive those benefits. Well, except that here you have a statute that has very carefully constructed rules about the circumstances under which a beneficiary of an SJ – of a QJ – a QJSA. It's alphabet soup up here today, Your Honor. Yes. Right? That's true. But, again, those statutes, if you look closely at the statute and you look closely at the QJSA benefit itself, it only concerns a right to – it only concerns who the plan pays. And that makes sense because there's more than one interest at issue. Okay. There's more than one interest at issue. Oh, go ahead, Judge. You've dealt with the – in this discussion, you've dealt with the divorce decree as if it were a matter of state law relevant to the disposition of this case. But there's a question as to whether – well, it's a question posed in Kennedy – as to whether it isn't a matter of federal common law as to whether that document has any force. If what you're asking me is whether or not Melissa's waiver satisfies the standards for a federal common law waiver as well as a state waiver, the answer is yes. That's the only question, isn't it? The answer, Judge, is yes. Federal common law waiver requires knowledge. It's the same standard as a state law. It needs to be a – it needs to be voluntary and it needs to be knowing. And that was plainly the case here. If you look at the divorce decree, it's an agreed divorce decree. It was prepared by Melissa's attorney. Both John and Melissa signed it as approved and consented to both form and substance. I can direct you. I guess when I look at it, I don't actually see the waiver, right? I see she gets all retirement benefits in the wife's name, which would have included the QJSA at this point, and he gets to keep all the stuff in his name. I know there was a later order from the court, but I don't actually see in the divorce decree where she knowing intentionally and expressly waives the right to the QJSA, something that was in her name at the time of the divorce decree. What the divorce decree says, and I'm looking at JA290, is that John Vanderkams awarded the following as sole and separate property. The wife is divested of all right, title, and interest in claim to that property. And then H4, all sums, whether vested, together with all increases, proceeds therefrom, any other rights related to a pension plan or other benefits existing by right of the husband's past, present, or future employment. So that's where the right originates. So where does that express that it covers something that's already vested and in her possession? That's what I'm not understanding. Well, when it says all sums, whether vested or otherwise, I think that's what that refers to. Okay. Because, again, the vesting. You mean vested in her rather than vested in him? I'm sorry, Your Honor. You mean vested in her rather than vested in him? Vested at all, whether in him or otherwise. Because, again, the vesting only has to do with who's entitled to receive it from the plan. Vesting under ERISA means that you have a non-forfeitable claim to a benefit. That's it. It doesn't go any further than that. I'm sorry, Your Honor, yes? No. Okay. So she's entitled to let the benefit go. She's entitled to surrender it for something else, which is what happened here. Now, I realize that she's reneging on that now, but it doesn't change the fact that that's what she did. And that's fundamentally different than what happened in Boggs and what the case was in Hillman. You've identified two provisions that are dueling here in the decree itself. Yes. One saying that she disclaims ownership of the benefits created by John's employment. And the other saying that she retains annuities in her name. So the Texas court apparently envisioned that there were two separate types of non-overlapping benefits. And there's an ambiguity here as to whether the benefits payable under ERISA constitute an annuity in her name. And that's a matter of federal common law. I think, Your Honor, the issue would be which provision is more specific. That may be, but as a matter of federal common law. As a matter of whether – oh, I see what you're asking me. Whether or not her waiver was knowing under – well, here's the thing about that, Judge, is that the waiver was – the Texas court determined that Melissa had waived the survivor benefit. And the standards for waiver under Texas law are the same as the standards for waiver under federal common law. Melissa did not raise any dispute that it was somehow not a federal common law waiver that she had. That issue has been decided. She's not permitted to contest it now. It is decided as a matter of fact. It's re judicata as to the parties. By virtue of what decision? By virtue of the Texas court's decision interpreting the divorce decree. Whether that's re judicata seems to me very much just a way of repeating the assertion that Texas law governs. And I'm saying I don't think that's necessarily right. Well, preemption is a defense to – is a defense. So if that's a defense that Melissa has or had in 2003 when the Texas court was considering this issue, that was something that she needed to raise at that time. Failing to raise it at that time means that she cannot raise it now. And in the district court here, she could have filed a counterclaim, correct? Seeking an injunction or a declaratory judgment by the terms of ERISA. She could have sought, yes, essentially the reverse of what John was seeking. She did not. So she – it seems to me that that precludes her from seeking the same relief as a matter of state law when she's basically abandoned her federal law claim. I would agree, Judge. I would actually assert that she – while she could have asserted the claim, I don't know that it would have stood. I think that that probably would have been re judicata as well for not having raised it before the Texas court in 2003. But I haven't – I'll admit I haven't given that a lot of thought. We have a very peculiarly misshapen case in front of us, which was the first thing pointed out by Judge Tatel in enumerating some of the key questions that are not before us. So we have – which I think bears also on whether we ought to exercise our remedial discretion, which we have with respect to denial of a declaratory judgment. Well, if – Because we cannot settle some matters in this case because of the peculiar way in which it's been brought forth. I guess I – the only issue that it seems to me that the court would not be able to determine is upon granting a declaratory judgment exactly what the mechanism is for Melissa to pay that benefit to John's heirs, John's beneficiaries. And that is something that can be taken care of at the time – in the event John predeceases Melissa, which is – I mean, frankly, given the age difference. As could all of this. I beg your pardon? As could all of this be handled at that point. Yes, but the issue came – the issue was before the parties, and as I think we mentioned in the supplemental briefing, John really didn't have much of a choice but to assert the claim now. And there really are harms here that are affecting the parties. I mean, I realize that it's – that there is some contingency associated with it, but a contingency alone isn't enough to find that there cannot be a ripe case of controversy. I think there very clearly is a concrete set of facts here for the party over the rights to this benefit that can be decided now. This case could result – I think you agree, I'm not positive of that – this case could result if we proceeded to judgment as a matter of federal common law in creating a conflict between Texas and federal law. It could be – I'm not sure I follow. Well, you've told us what Texas law provides, and if the question of the federal common law before us is resolved differently, we will have created a conflict between the two. I think, Judge, I do want to get back to the federal common law. I'm going to try and answer that by trying to clarify something, and let me know if I do because I'm not sure I completely understand your question. Federal common law comes into play when there is a federal benefit at issue. The federal benefit at issue here is the right to receive the benefit. I don't want to interrupt your answer, Tim, but why is it common law? Isn't it statutory under ERISA? There are – well – Isn't that what we're talking about? We're talking about the rights – if ERISA wasn't here, we wouldn't be here today. Yeah, but we have a statutory – Melissa claims she has a statutory right to this. So now – I mean, I'm sorry to interrupt your answer to the question, but I don't see where the common law comes in. If she's wrong – yeah, go ahead. If she's wrong about her statutory right, then it seems to me, you know, you prevail. But I don't see why we could be on – Tim, go ahead. You can answer the question, sir. My understanding of Kennedy and the footnote 10 in Kennedy is that the court said that interpretation of a divorce decree, i.e. a state decree, is not a state but a federal common law question. Isn't it just a preemption question under ERISA? I don't think so. No? Okay. I don't have Kennedy in front of me. We have more questions for each other. Do you have anything else to say before – we're way over time. So why don't we hear – are you done at the moment? Okay. Why don't we hear from Mr. Fuller, okay? Thank you, Your Honor. Good morning. May it please the Court? Your Honors, Charles Fuller on behalf of the FLE, Melissa Vanderkam. I think I'd like to take this back to the beginning of the oral argument. That would be a good idea. It seems to me that this case is properly decided between the Hillman, Boggs, and Carmona decisions. Those three decisions combined really hit the crux. Well, Carmona is not binding on us. It's not binding. Okay, so go ahead. I would agree, but I think it's very instructive, Your Honor. And as a fund counsel who deals with quadros regularly, Carmona is part of our daily practice in following this. It is very instructive for plans. A want of anything else until now? Well, you can always say with ERISA there's always a want of everything else. I had a law professor that said ERISA stands for every ridiculous idea. We would all agree with that. I'll bet your opposing counsel would agree with that, too. Our colleague, Judge Sentell, wrote an article some years ago entitled RICO, the statute that ate jurisprudence. And now we have another one in front of us. But what we really have to get back to here is when you look at Hillman, you look at Boggs, you look at Carmona, what is the right that Congress was trying to protect in this case? And it's not merely the right of the plan to distribute the qualified joint survivor annuity to the surviving spouse. In Boggs, the Supreme Court said that the purpose of ERISA's QJSA was to ensure a stream of income to surviving spouses. But it also went on and it said that ERISA's solicitude for the economic security of surviving spouses would be undermined by allowing the state law to intervene in that case and step in and take the QJSA. So it goes much more than just the payment and receipt. Economic solicitude or the solicitude for the economic security of the surviving spouse, that encompasses a much greater right than just receipt of benefits because I think the court would agree that if the benefits are paid to Melissa and then they are taken away through the constructive trust, her economic security is shattered. It doesn't exist. And, therefore, it flies in the face of what the Supreme Court said in Boggs. And the court in Kennedy, which it comes both later and I think is closer, factually closer in point to this case, says that the reasons that they protect the interest being protected there is that of the plan administrator essentially, right? Well, I agree that that's what Kennedy said, but Kennedy is distinguishable, Your Honor, because it doesn't deal with the qualified joint and survivor annuity statute. It's a savings and investment plan. It's nothing more than like a bank account. It's the purpose of ERISA that was being discussed. I'm sorry? It was the purpose of ERISA that was being discussed, right? In Boggs? In Kennedy. Generally, but they were not queuing in on the joint and survivor annuity statute 29 U.S.C. 1055. That specific statute that was enacted under the REA in 1984 gave very specific rights, and Congress demonstrated a strong concern for surviving spouses and their economic viability after the participant predeceased them so that they could survive on their own. And it makes good public policy arguments. Kennedy was explicit that they weren't expressing any view on whether an estate could bring an action against the spouse after they received the post-distribution suit. But note 10, nor do we express any view as to whether the estate could have brought an action in state or federal court against Liv to obtain the benefits after they were distributed. So is your point that simply as of now there's no action, but post-distribution they could bring an action asserting this waiver issue? No, I think that Hillman says they can't do it because in Hillman what the Supreme Court did was they looked at Congress' intention. And what was Congress' objective in the federal statute? And in Hillman it was that the benefits belonged to the person identified in the statute. In that case, it was not a surviving spouse. It was the beneficiary, the planned beneficiary, the person that was actually named on a piece of paper signed by the participant. And that belonged to them. And therefore, they said, you cannot step in under the guise of state law or anything else and pull that away because those benefits belong to the beneficiary. But it was because they were trying to protect the intention of the participant in designating the beneficiary. That was Congress' intent under Hillman, under the Feiglian. Not just the wife as in Boggs, but whomever the intended beneficiary is. In Hillman, yes, because they were dealing with a different statute. But Hillman is instructive because it's recent and it shows Congress' the way they view these matters. Now if we step over to the QASA statute, that is very specific to the surviving spouse. And what we've missed completely here that has not been addressed here is that Kennedy reinforced the importance of the planned document rule, but it also indicated that ERISA's anti-alienation rule does not categorically bar the waiver of benefits under an ERISA plan. In other words, what Kennedy says is that the rights can be waived if in conformity with the plan. You have to stick with whatever the plan allows you. You can't create new rights, jump outside of the plan. Your waiver of rights has to be confined within what the plan allows. Could your client, ten years from now, if you think she's on the verge of getting these benefits, write a contract with somebody that says, in exchange for that house or car, when I get this money, which I think I'm going to get in about six months, I will give it over to you. And then nobody would be able to do anything until actually she has the bag of money, and when she has it, could someone enforce that contract? Well, that's a good question, Your Honor. I'm not positive of the answer. I think that they can because she's using it. She is taking that money and her own economic security, whatever you want to call it, is being used. She is invoking that. She's going to take that money and use it as part of the negotiations in the divorce decree. That's their argument. The contract for the car or for the exchange that went on the divorce decree, it's the same thing. Sure, except Congress has intervened in this area in pensions, in divorces, and they say you can't do that. What you can do is you can have it reduced to a quadro. So you can have a property settlement agreement. You can have a domestic relations order from the state court. But that doesn't mean that it's enforceable because it has to be qualified. I'm sorry. So is your answer to Judge Millett then that, going back to her hypothetical, that yes, Melissa could give the money away or negotiate it away, but since there's never been a legitimate ERISA waiver, no court can force her to do that. Is that your point? That's correct, Your Honor. She can do it. She can take the money she wants with it, but she can't be ordered to do it without violating ERISA, right? Exactly, because that's what Boggs says, her economic security, the economic security of the surviving spouse. You can't just pull the rug out from underneath that. Just to be clear, would ERISA govern the validity of the waiver for the car? No, I think that that's a consumer action. So it's just because this is kind of unusual because it seems like ERISA sort of set up domestic relations as one way of actually getting out of the alienation provisions if you have the QDRO. Correct. What ERISA says is that if you don't have the QDRO, then wouldn't you be in the same position as all other alienation or assignment of benefits under ERISA? If you don't have the Quadro, you can't touch the benefits because it has to be qualified under the plan. You can have a domestic relations order, but that doesn't mean it's enforceable under the plan. Because it hasn't been qualified. Section 414P of the Internal Revenue Code has that exception to the anti-alienation rules. So Congress says when you can do that, not someone else. The parties can't say that. Congress has intervened in the area and said, we are preempting this area. Federal law is going to apply. And if you want to get out of it, then you have to meet this criteria, and you have to meet the criteria of a Quadro, which includes, among other things, you have to identify the plan, you have to identify the parties, where they last resided, their dates of birth. You have to say what benefits are being assigned, how they are being calculated, whether it's through a plan. There's the Bangs formula. What's a little confusing to me is we have two, and I want to make sure you get to Judge Ginsburg's question, but we have two court rulings on whether this is a Quadro, neither of which was appealed. The Texas court said, this is a QDRO, you've waived your interest, and your client didn't appeal. So as a matter of Texas state law, she's waived it. As a matter of the federal district court here, there is no QDRO, and that hasn't been appealed. Now, no one's appealed the QDRO issue to us, but waiver seems to be critical. I can give you a very simple answer. The state court does not have the power to enter a Quadro. Only the plan. The state court issues an order. It's called a domestic relations order. That order is then taken by the parties. One of the parties to the plan, and under 414P of the Internal Revenue Code, the plan then reviews the domestic relations order, and does it meet the requirements of a Quadro, and the requirements in the plan. I guess what I'm trying to understand is, it's five years from now, she's got the bag of money. Can Mr. Vanderkam's estate then bring a state law waiver action, saying, look, Texas courts found a waiver, plain old ordinary waiver, trade, quid pro quo for this money. It's post-distribution now. I'm not affecting the ERISA plan. I just want, we think you've done a waiver. You didn't appeal the finding of waiver. You're stuck as a matter of Texas common law that you waived your right to this bag of money. Could they do that? No. Carmona tells us that they can't. Do you have any thoughts about the debate we had with Mr. Jeffries about the meaning of the original divorce decree and what effect that has on this? I didn't hear everything you said, Your Honor. I'm sorry. Do you have any thoughts to add about the original divorce decree and whether that was, John argues that Melissa waived her rights. She says she didn't. Do you have anything to add about the language of that decree? Well, just the only thing is, is that I don't think it, even if parties can agree to waive, but if it's not reduced to a quadro, that is an unenforceable agreement between divorced parties regarding pensions. They can waive other things. Who owns the house? Who owns the car? Who does this? That's all enforceable under state law, but pensions are not. So they can agree to waive, but it doesn't necessarily mean it's enforceable. Well, is your argument then it really doesn't make any difference what the divorce decree says that since she had a vested QJSA at that time, right? Correct. That it could only be waived in accordance with ERISA? Is that your point? So it makes no difference what the divorce decree says? In this case, no. Because the divorce decree was deficient. The divorce decree was what? Deficient. It didn't meet the level. It didn't meet what? It wasn't a knowing waiver of her rights. It doesn't even refer to the joint survivor annuity, which is a very stickler point in terms of federal common law. In Kennedy, for instance, the court refers to the waiver, and they waived the specific benefit. It was named. That's a big difference from here in this general smorgasbord of words, but there's no survivor annuity referred to in there. Mr. Cooley, you joined the appellant in suggesting that this case is now ripe and should be decided now. I agree with you on the answer. So tell me why. What is your client's interest here, Melissa's interest here? At this point in time, she has a vested irrevocable right to the qualified joint survivor annuity. That's the cases that were cited, the Hopkins case, the Rivers case. You're saying that's true, whatever we say, right? Well, so she should be able to proceed with that and live her life accordingly. You can't do anything one way or the other until John dies.  Well, we all do that, Your Honor. Well, no, but why isn't that important? Well, it is. It's a factor, but it's not the controlling factor because what happens is that we all live our daily lives, and as counsel was indicating, we have to plan for the future. She has very real decisions she needs to make today. Then why didn't she counterclaim when she could have? She didn't need to. She, at the time, this suit. There's a statutory provision authorizing her to do that, a kind of a quiet title provision, and she passed on it. Your Honor, at the time she was brought into this suit, the PBGC had ruled that that was hers. So the ball was in her court. She didn't need anything else. John was attacking it. Well, is the PBGC, I'm sorry, too many acronyms here. Absolutely, Your Honor. Is the PBGC's determination that something is not a QDRO binding on federal courts, or was there a risk that a federal court would have disagreed, and so she should have protected her interest by filing that counterclaim? No, the plan, in this case, the PBGC is the plan because they took it over as a statutory question. They said it's not, it might be a domestic relations order, but it's not a qualified one for purposes of ERISA, right? That's correct. They said it was not a qualified domestic relations order, but they said when they took this file over, they reviewed the file, and they looked at it, and they wrote to the Vanderkamps and said, I understand, but I'm again trying to follow up on the question here as to why she was so certain about her rights because the original plan had said it was a qualified domestic relations order, and then the PBGC, when it took over, said we beg to differ, and then a lawsuit is brought in federal court. So I'm curious as to why there was so much confidence that this would not be deemed a qualified domestic relations order in the federal court litigation, so much confidence that she didn't bring a counterclaim to quiet her title to it. Sure. I understand. But looking at the documents that were presented to me at the time, it was clear in my view that the PBGC properly evaluated this claim. There were no instances in my review of the file that indicated that there was any erroneous consideration of facts or law. So you saw no need to become a party just to protect your client's rights here? No. The plan administrator said that that was good, so those rights are golden as far as she's concerned, unless they're taken away from her, and we didn't believe that to be the case. Okay. Anything else? Okay. Mr. Jeffries, you used up all your time, but you can take two minutes. Remember, we used up all your time. We used up all your time. Thank you, Your Honor. There are just a couple quick points I want to get to. First is Judge Millett's hypothetical about a contract ten years from now and whether or not an agreement by Melissa to give that to somebody else or assign it to somebody else or use it to buy something else would be enforceable. Counsel agreed that it was. The distinction that he makes here is that there was no quadro that permits that, and this is an important point. Quadros only concern the right to receive benefits, and they only concern the rights that are going to be enforceable against a plan. Quadros, if you look at 29 U.S.C. 1056 D3B, defines a quadro, and it defines it as an alternate payee's right to receive all or a portion of a benefit. So it doesn't affect Melissa's waiver of the right to retain the benefit upon receipt, and that's the critical distinction in this case. And to the extent there's any further questions about what a quadro actually does, you have to look at how it works in ERISA, and what a quadro is is it is an exception to two provisions of ERISA, the anti-alienation provision and the preemption provision. The anti-alienation provision states that a pension plan cannot permit the transfers of rights enforceable against a plan unless you have a quadro. If you have a quadro, then someone can enforce those rights against a plan. The ERISA preemption statute says that any state court order that you might bring to a plan to alter its administrative scheme is preempted because it relates to the plan. But if it's a quadro, it's an order that the plan has to follow. I realize that my time is almost up here. I just wanted to make that point and tell you thank you very much, Your Honors. Yes? No, go ahead. Finish your sentence. I was just going to wrap up by asking that the court reverse the judgment of the district court. So what is your position on whether the Texas court order, quote, relates to, close quote, a plan here? The Texas court order does not relate to the plan because it's not being used to enforce any rights against a plan. That Texas court order is only being, all the Texas orders are only being used in this case by John to enforce his right to the benefits that Melissa receives upon his death. And it doesn't relate to the plan because it doesn't affect the administrator? That's correct, Your Honor. Judge Miller, did you? I'm sorry? No, I mean, the whole reason they sought the order was to have a qualified domestic relations order that would affect the plan. And so you're saying if it fails in that effort to affect the plan, then it doesn't? It's still a valid state court order. Is it relevant? Yes. A quadro is a state court order that is qualified. So irrespective of whether it's ever qualified under ERISA, it's still a valid state court order. And the dispositions of the issues that the court made and the findings of fact that the court made in those orders are valid state court orders. They just, they simply can't be enforced against a plan. I'm looking for my notes. Wasn't, you say the difference, but in Hillman it didn't, there was no order against the plan either, right? Hillman was only about the possibility of a state court action against the benefits. Hillman involved a state statute that gave somebody a right to take benefits from someone who had not waived or disclaimed or awarded them to anyone else. Correct, but there was no order against the board. I'm sorry? There was no order against the administrator. That's correct. So it's like this case. I thought you were distinguishing your case from the others on the grounds that. . . In the sense that there was no, in the sense that no one was seeking to enforce an order against a plan, yes, that case is like this case. Okay, thank you. All right, great. Thank you. The case is submitted. Thank you.
judges: Tatel, Millett, Ginsburg